UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

BRODERICK MOUTON                  CASE NO.  6:18-CV-00484

VERSUS                            JUDGE ROBERT R. SUMMERHAYS

UNITED STATES OF AMERICA          MAGISTRATE JUDGE HANNA

REASONS FOR JUDGMENT

 This is an action brought under the Federal Tort Claims Act ("FTCA") against the United

States of America for personal injuries allegedly suffered by Plaintiff Broderick Mouton in an

automobile accident involving a government employee, Glenn Meier. The Court took the matter

under advisement following a bench trial. After considering the trial record, the arguments of

counsel, and the relevant authorities, the Court now makes the following findings of fact and

conclusions of law.

I.
THE TRIAL RECORD AND THE COURT'S FINDINGS OF FACT

A.  The Collision

 Plaintiff Broderick Mouton alleges that he was injured when the car he was driving collided

with a vehicle driven by Glenn Meier, an employee of the United States Federal Aviation

Administration ("FAA").  Specifically, Mouton was driving a two-door passenger car southbound

on University Avenue in Lafayette, Louisiana, on June 17, 2014, when his vehicle collided with a

four-door passenger car driven by Meier. Meier was acting within the course and scope of his

employment at the time of the accident. Prior to the collision, Meier was traveling eastbound on I-

10, took the University Avenue exit, and attempted to merge into the right southbound lane of

University Avenue. The vehicles driven by Mouton and Meier collided as Meier entered the right

lane of University. Based on the trial record, the two cars stopped approximately 100 feet or less from the end of the I-10 exit ramp onto University.  Meier's car stopped on the shoulder of University southbound, and Mouton's car stopped in the right lane of University approximately half a car length behind Meier's car.

The primary damage to Mouton's car (and the primary impact point) appears to be the front passenger side corner of the bumper and side headlight, although there was additional minor damage on the passenger side of the car and the vehicle's front passenger hubcap.  (Trial Exhibit ("Tr. Exh.") 7 at 4-7). The damage to Meier's car appears to be limited to two small, shallow indentations and paint scrapes above and around the rear driver's side wheel well. (Tr. Exh. 7 at 1-2). While the damage to both vehicles was more than merely the "paint-only" damage alleged by the government, the structural damage to the vehicles was minor. This minor damage is consistent with a low-speed/low-impact collision.

**B.  <u>Conflicting Testimony on How the Accident Occurred and Fault</u>**

At trial, the parties and witnesses provided different versions of the events leading up to the accident. Meier testified that there was a yield sign at the end of the exit ramp lane that merges onto University Avenue, and that he observed that the right southbound lane of University was clear when he reached the yield sign. Meier testified that he did not see Mouton's vehicle but that, shortly after entering the right lane of University Avenue, he felt Mouton's vehicle gently making contact with the back end of his vehicle and gradually pushing his vehicle over to the right shoulder of the road.

Defendant contends that Meier complied with the yield sign, saw that the right lane of southbound University Avenue was clear and properly merged into the lane.  Defendant further contends that Mouton was traveling in the *left* lane of southbound University Avenue and struck

Meier's car when Mouton changed lanes. Defendant argues that Meier's vehicle had already established possession of the right lane and that Mouton improperly and negligently changed lanes and caused the collision.  Mouton, on the other hand, testified that he was driving in the right lane of southbound University Avenue prior to the collision and never changed lanes. He testified that Meier failed to yield when he merged into the right lane. He also testified that Meier's vehicle was moving fast at the time of the collision.

Three additional witnesses testified at trial: Roseanne Albrecht, Anthony Tolliver, and Shane Bruno. Albrecht is a contractor for the FAA and was a passenger in Meier's vehicle at the time of the collision. Albrecht testified that she was sitting in a rear passenger seat and was working on a laptop computer at the time of the collision. After Meier merged onto University Avenue, Albrecht felt a slight bump to the vehicle and then Meier stopped the vehicle. She testified that collision was gentle and did not disturb the computer on her lap. After Meier stopped, Mouton, Meier, and Albrecht exited their vehicles. Albrecht testified that Mouton was agitated about the damage to his vehicle and that at one point she was apprehensive that he might be physically aggressive toward Meier.

Tolliver and Bruno also witnessed to the collision. Tolliver testified that he was driving in his own vehicle on southbound University Avenue at the time of the collision. He testified that at the time of the collision his vehicle was approximately two to three cars behind Mouton's vehicle. He testified that Mouton was traveling in the right lane when the collision occurred, that Mouton did not change lanes, that Meier failed to yield to Mouton's vehicle, and that Meier struck Mouton's vehicle as Meier attempted to merge onto University Avenue.  He thus corroborates Mouton's version of the accident.

Tolliver, however, did not stop at the accident scene.  He continued to travel down southbound University Avenue.  He testified that later he attempted to return to the accident scene, but the accident had already been cleared and the parties were no longer present.  The first time he gave his account of the collision was to Mouton's counsel in June 2016. Tolliver first testified that he did not know Mouton.  He then clarified that he knew Mouton by his car because it was distinctive, and Tolliver had communicated with Mouton in the past about the possibility of buying the car.

The second witness was Shane Bruno, who was an employee of the Lafayette Fire Department at the time.  At the time of the accident, Mr. Bruno was in his fire department vehicle stopped at the intersection of Alcide Dominique Drive and University Avenue. Bruno's vehicle was thus parked on the same side of University Avenue but further down the road from the accident scene.  Bruno testified that he was looking in the direction of the collision when it occurred.  He testified that Mouton's vehicle was initially traveling in the left lane of southbound University Avenue but then Mouton attempted to change lanes and enter the right lane while Meier was merging into the right lane from the I-10 exit ramp.  According to Bruno's account, neither vehicle had fully occupied the right lane when the vehicles collided.

The court finds that Mr. Bruno's account of the accident is the most credible.  Meier's account of the accident – that he had fully occupied the right lane before he felt the impact is consistent with the point of damage to the two vehicles, but it is not consistent with where the vehicles were located when they stopped following the accident.  That location was approximately 100 feet or less past the exit ramp entrance onto University Avenue.  If the accident had occurred as portrayed by Meier, the impact and subsequent location of the vehicles after they stopped would have been further down the southbound side of University Avenue.

On the other hand, Mouton's account of the accident is not consistent with the point-of-impact damage to the vehicles.  Mouton testified that he was traveling 30-40 miles per hour southbound on University, close to the speed limit.  He testified that Meier was traveling even faster coming off the exit ramp.  If Meier had entered University Avenue and struck Mouton's vehicle traveling in the right-hand lane, the damage would have been more significant than the small indentations and scrapes near the rear tire well of Meier's car. It also likely would have been concentrated toward the front of Meier's vehicle.

Bruno's testimony that Mouton was in the left lane and attempted to change lanes and occupy the right lane is more consistent with the point-of-impact damage to the vehicles. Furthermore, if both drivers were attempting to occupy the right lane at the same time (as Bruno testified), the collision and the area where the vehicles ultimately stopped would be closer to the end of the exit ramp from I-10, which is consistent with the trial record.

Mr. Tolliver's account of the accident, which corroborates Mouton's testimony, similarly is not supported by the evidence.  Tolliver also had an obstructed view of the collision because he was travelling two to three vehicles behind Mouton's vehicle. Even more importantly, unlike Bruno, Tolliver knew Mouton. That fact and the fact that Tolliver never stopped at the accident scene and gave his witness statement for the first time two years after the accident undermines the credibility of his account.

Accordingly, the Court finds the following facts with respect to the collision based on the trial record:

(1) Meier exited I-10 and merged into the right lane of southbound University Avenue;

(2) Mouton was in the left lane of southbound University Avenue and attempted to move into the right lane around the same time Meier was attempting to merge into the right lane; and

(3) the location of the impact points on the two cars indicate that, at the time of the collision, Meier was in front of Mouton; specifically, the impact point on Mouton's car was the corner of the front bumper on the passenger side, and the impact point on Meier's vehicle was near the rear wheel well on the driver's side of the vehicle.

### C.   Testimony from the EMT Paramedics Responding to the Collision

Travis Duplantis and Julie Overby were EMT medics for Acadian Ambulance who responded to accident scene.[1] Overby testified that she first determined Mouton's medical status. (Tr. Exh. 31 at 10) She testified that she assesses a patient's medical status on a scale of 1 to 4. (*Id.*)  A "4" represents a patient who is not critical, needs no invasive procedures, and does not need a paramedic in the back of the truck. (*Id.*) In this case, Mouton's status was a "4" when Overby arrived on the scene.  (*Id.*) Overby also noted that, in the EMTs' report, the vehicle damage was classified as minor with "paint only damage to the passenger's side front bumper" with respect to the plaintiff's vehicle.  (*Id*. at 14)

Duplantis testified that when he arrived at the scene of the accident, Mouton did not have any obvious injuries but was complaining of neck pain.  (Tr. Exh. 30 at 11)  Duplantis testified

---

[1] These witnesses testified by deposition.

there was nothing in his report suggesting that Mouton complained of low back pain or a head injury:

> Q:   Is there anything in your report that suggests he had complaints of low back pain?
>
> A:   Not in my reports, no. I see right flank pain in my narrative, and I see pain to the neck. That's all ….

*Id*. at 12.

### D.   Mouton's Injuries in Accidents Before and After the June 2014 Accident

Mouton was involved in a work-related accident on June 7, 2013, while employed at Spacewalk of Acadiana. Mouton testified that he experienced significant pain in his lower back with radicular symptoms into his legs while lifting a large "fun jump." Mouton filed for workers compensation and received treatment for his back injury. (Tr. Exh. 9) Specifically, Mouton sought treatment on the day of the accident and for several months after the accident for back and radicular leg pain. On August 16, 2013, Mouton called Acadian Ambulance because of the intensity of his back pain. Acadian Ambulance records indicate that Mouton had a "traumatic back injury 6/7/13," the date of the injury he suffered working at Spacewalk of Acadiana. (Tr. Exh. 13 at 6) Mouton was also admitted to Our Lady of Lourdes Regional Medical Center in Lafayette on July 16, 2013, complaining of a foot injury. Mouton's medical records for this visit state that his "active problems" include "back problems." (Tr. Exh. 21 at 129) Mouton also received prescriptions for pain relief medication after the Spacewalk injury in June 2013 but before the June 2014 accident at issue in this case.

In 2018, Mouton was involved in another accident. Mouton was driving a tractor-trailer in the course and scope of his employment with Planet Earth Trucking when the truck overturned as

he attempted to make a right-hand turn on January 9, 2018. Mouton was treated in a McComb, Mississippi emergency room following this accident. (Tr. Exh. 16)

### E. Mouton's Employment After the 2014 Accident

Mouton continued to work after the June 17, 2014 accident. Specifically, he worked as a groomer for Chadwick Mouton Racing and attended Coastal Truck Driving Academy. He also worked in positions for Nobel Enterprises, and as a commercial truck driver until his accident on January 9, 2018. Mouton acknowledged that his work as a groomer required physical activity. Mouton did not return to work after the January 2018 roll-over accident.

### F. Evidence on Damages and Medical Treatment and Expenses

Mouton seeks compensation for property damage to his vehicle, medical expenses, lost wages, mental and emotional pain and suffering, physical pain and suffering, disability, and loss of enjoyment of life. Mouton offered the testimony of three of his treating physicians: Drs. Thomas Bond, John Sledge, and David Weir. Defendant offered the testimony of its independent medical examiner ("IME"), Dr. Neil Romero.[2]

#### 1. Dr. Thomas Bond

Dr. Bond was Mouton's primary physician for pain management after the June 2014 collision. Bond is qualified in musculoskeletal orthopedic medicine and interventional pain management. Mouton started seeing Bond after the 2014 collision.  (Tr. Exh. 32 at 9, 12)  Bond testified that he mainly performs injection therapy, but ultimately referred Mouton to Dr. Sledge for a surgical consult in 2017. Mouton was not scheduled for cervical surgery until November 2019. Bond testified that he was unsure about the reasons for the delay in surgery but knew that the plaintiff wanted to avoid surgery if possible. (*Id*. at 17) Bond testified that Mouton was "at my

---

[2] These witnesses testified by deposition.

limits as far as writing pain narcotic....narcotic pain medication," yet continued to struggle with pain.  (*Id*. at 20)

Bond saw Mouton for pain in his neck and his back.  *Id*. at 24.  Bond indicated that he would note in the first sentence of the visit description whether it was for neck or back primarily. (*Id*.) The Court, however, notes that the documentation for these visits refers to neck and back pain (and apparently pain from other conditions), but does not clearly segregate treatment expenses in a way that allows those expenses to be categorized by injury. (Tr. Exh. 23) Bond testified that he had no knowledge of the severity of the impact involved in the June 2014 collision. He saw no pictures or video of the incident.  (*Id*. at 33)  Everything he knew about the accident was based on what Mouton told him.  (*Id*.)

According to Bond, since the injections given to Mouton in 2016, Mouton's only treatment has been pain medication. (*Id*. at 41) Bond testified that he attempted to get Mouton referred to a specialist in pain management, however, "no one would take him."  (*Id*. at 52) On examination by plaintiff's counsel, Bond related Mouton's neck and back pain to the June 2014 automobile accident. (*Id*. at 54) However, the record does not indicate that Bond treated Mouton prior to the 2014 collision.

### 2.  Dr. John Sledge

Dr. Sledge is Mouton's orthopedic surgeon. Mouton's first visit to Sledge was in 2017. Prior to his surgery, Mouton visited Sledge a total of six times – twice each in 2017, 2018, and 2019.  (Tr. Exh. 33 at 6)  According to Sledge, Mouton reported neck pain with a disc herniation that also had some "upper extremity radicular" symptoms. (*Id*. at 17)  Mouton also reported back pain from the lower lumbar levels with associated lower extremity symptoms.  (*Id*.)  Sledge testified that the nature and seriousness of an accident plays a role in his evaluation of a patient,

but his primary focus is to look for injuries associated with the patient's symptoms.  (*Id*. at 10)

Sledge also testified that his usual procedure is to look for a mechanism of injury and determine

whether that mechanism causes the type of injury claimed by the patient  (*Id*. at 11) Sledge testified

that his knowledge of the 2014 collision was based solely on Mouton's description. According to

Sledge, Mouton told him that he struck his head on the roof of the car during the collision, was

unconscious for about three minutes, and that the police opened his door and placed him in an

ambulance.  (*Id*. at 10)

Mouton also discussed his work and medical history with Sledge. At his initial appointment

in January 2017, Mouton told Sledge that he was not working. (*Id*. at 19) When Defendant's

counsel informed Sledge that Mouton had worked with horses, worked for Frank's Casing Crew,

and drove tractor-trailers after the 2014 collision, Sledge acknowledged that this information

"would be inconsistent with him telling us that he was not working at the time, yes." (*Id*. at 38) As

far as Mouton's medical history, Sledge also testified that Mouton did not tell him about the 2013

worker's compensation claim or the "traumatic back injury" suffered as a result of the 2013 lifting

accident at Spacewalk. (*Id*. at 40) According to Sledge: "I don't know if that complaint was for

shoulder or for back or for what it was, I have no--I don't believe I have knowledge of that

complaint."  (*Id*. at 41)  Sledge testified that, based on the information Mouton provided, Mouton

had made no complaints to his primary care doctor and made no visits the emergency room with

complaints of neck or back pain prior to the 2014 collision. (*Id*. at 15)

Sledge testified that he did not make an initial recommendation for surgery. His first

recommendation was physical therapy.  (*Id*. at 18) Sledge testified that Mouton did not undertake

physical therapy. Mouton stated that he could not undertake physical therapy because he was

taking care of his father who suffered a heart attack.  Mouton also told Sledge that he had attempted physical therapy in the past and that it did not work.  (*Id*. at 20)

Sledge testified that after meeting with Mouton, he determined Mouton had completed all the conservative treatment options and that the next step was to develop a treatment plan involving something "more specific for an interventional treatment standpoint." (*Id.* at 22) Accordingly, Sledge requested that Mouton obtain an EMG of his upper and lower extremities. Sledge reviewed the EMG findings and recommended a "C5-C6 anterior cervical [neck] discectomy and fusion" and an "L4-L5 and L5-S1 lumbar [lower back] decompression and stabilization." (*Id*. at 28)

Sledge attributed Mouton's neck, back, and head injuries to the 2014 collision at issue in this case. He explained that this conclusion is based on his reviews of MRI and X-ray images. (*Id*. at 53-54)  Sledge testified that while you cannot assign a specific date to an injury, you can determine a timeframe for the injury. (*Id*.)  Sledge testified that he could not opine that Mouton's injuries occurred in June of 2014, but he could determine that the injuries probably did not occur as recently as 2016 or as early as 2010.  (*Id*. at 58)  "So if there was another significant event around timeframe, 3 months before it or 3 months after it there is no way for me to tell which of those 2 events caused that." (*Id*.) Sledge added that "the only event I have occurring with that timeframe is this one [the 2014 collision]." (*Id*.) With respect to whether the January 2018 accident contributed to Mouton's injuries, Dr. Sledge's recommendations were based in part on the EMG that examined Mouton's radicular symptoms, and this test was performed *before* the January 2018 accident.  (*Id*. at 15)

### 3.  Dr. David Weir

Mouton was referred to Dr. Weir by Dr. Sledge "for evaluation of his headaches, memory loss, insomnia, and irritability." (Tr. Exh. 34 at 13) Mouton's first visit with Weir was September 2017.  (*Id.* at 6) Weir testified that Mouton described the 2014 collision. According to Mouton, he was "essentially side-swiped on the passenger side with extensive damage to his motor mount shaft, front grill, fenders, the doors, as well as his mirror along the side of the car."  (*Id.* at 9) Plaintiff also stated that he struck his head on the roof as well as the side door frame but "did not lose consciousness but did have some dizziness and a slight alteration in his consciousness." (*Id.*)

Sledge requested that Weir perform an EMG nerve conduction study.  (*Id.*) Weir explained that he was in possession of some MRI images as well as a CT scan of Mouton's cervical spine. He did not recall whether he had all the MRI images taken of the spine.  There was an October 2016 MRI of the lumbar spine.  He also had an MRI of the cervical spine on October 2014.  (*Id.* at 21-22) Weir also discussed some of the drugs Mouton was taking, including zonegran, naprosyn, imitrex, and botox.  The purpose for these drugs appeared to be "headache blocking." (*Id.* at 22)

Weir testified that an "acute" injury is something occurring within a couple of weeks, but there is no way to date the "chronic finding" shown on the EMG.  (*Id.* at 27)  A chronic condition "could be more than 2 weeks or it could be 3 years." (*Id.*) Weir testified that as far as "dating" the injury, a patient's reported symptoms would be important. (*Id.*) Weir testified that during Mouton's October 2017 visit, Weir could feel spasms in Mouton's cervical (neck) muscles. (*Id.*)

### 4.  Dr. Neil Romero

Dr. Romero, the defendant's IME, performed a medical examination on Mouton on March 22, 2019. Romero testified that, based on his examination and review of Mouton's records, cervical surgery was not indicated. He further testified that to the extent that lumbar surgery was indicated

at some point, he did not connect it to the accident at issue.  (Tr. Exh. 29 at 7)  Romero testified that, in his opinion, Mouton's condition "could be effectively treated by physical therapy, core strengthening, and a home exercise program." (*Id*.) He acknowledged that there was no real evidence that Mouton attempted a physical therapy regimen. (*Id*. at 8)

Romero testified that the complaints made by Mouton with respect to his neck might be related to a mild aggravation of underlying degenerative conditions based on his review of Mouton's records.  (*Id*. at 8)  He further testified that Mouton's neck complaints were more likely than not aggravated by his accident in January of 2018. (*Id*.) Romero examined Mouton's cervical and lumbar spine and noted a decreased range of motion with regards to both the lumbar and cervical spine.  (*Id*. at 9)  He reviewed Mouton's x-rays and two MRI's.  With respect to x-ray findings on his cervical spine, he saw very mild disc space narrowing.  (*Id*.)

According to Romero, the MRI taken shortly after the 2014 accident was consistent with mild degenerative changes without evidence of "acute appearing pathology."  (*Id*. at 9-10)  The MRI taken two years after the accident on his lumbar spine was consistent with degenerative changes with "disc protrusions causing mild to moderate stenosis." (*Id*. at 10) Romero testified that Mouton never told him that he fallen off a roof in May 2011. (*Id*.) Mouton informed Romero that he was injured in a June 2013 lifting accident and experienced low back pain and "bilateral" leg symptoms.  (*Id*. at 13) Plaintiff had also told Romero that he had been seen by an EMT in August 2013 with respect to his back pain. (*Id*. at 14) Romero noted that when Mouton saw Dr. Bond following the 2014 collision, there was only a mention of cervical spine (neck) symptoms without any mention of lumbar spine (lower back) symptoms until a later visit several months after the accident. (*Id*. at 14-15) The first indication in the record of a surgical recommendation by Dr. Sledge was July 2018.

Romero reviewed records from Mouton's truck roll-over accident in January 2018.  Those records showed an increase in Mouton's symptoms. (*Id*. at 16) Romero noted that Mouton appeared to have received numerous trigger point injections by Dr. Bond and some cervical facet injections, but no lumbar injections. (*Id*. at 23) In Romero's opinion, physical therapy, core strengthening, and a lumbar injection would have helped Mouton's symptoms. (*Id*.)

Romero did not relate his lumbar findings to the 2014 accident because he felt those findings were consistent with a "chronic appearing degenerative condition that likely preexisted the accident." (*Id*. at 24) Romero testified that Mouton could be a surgical candidate for his lumbar spine condition, but that "I just believe that more than one visit of physical therapy would be indicated to try some non-operative treatment for his lumbar spine before going to surgery." (*Id*. at 26) Romero testified that he does not believe that it is possible to "look at an MRI that was performed over 2 years after an accident and say that he can look at those findings and say those occurred within a few months of an accident over 2 years previous." (*Id*. at 27-28)

## II.
### CONCLUSIONS OF LAW

Mouton's claims are brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80, which "provides broadly that the United States will accept liability for common torts committed by its agents to the same extent and in the same manner as liability would attach to a private individual in similar circumstances." *Williamson v. U.S. Dept. of Agriculture*, 815 F.2d 368, 374 (5th Cir. 1987). Jurisdiction is granted by 28 U.S.C. § 1346(b)(1). The substantive law of Louisiana applies to the claims brought in this suit. *Cleveland ex rel. Cleveland v. U.S.*, 457 F.3d 397, 403 (5th Cir. 2006); *see also* 28 U.S.C. § 1346(b)(1).

"Louisiana Civil Code Article 2315(A) provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The duty/risk

analysis assists in the determination as to "fault" and requires the establishment of the following elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of protection element); and (5) whether the plaintiff was damaged (the damages element)." *Cobb v. Delta Exports, Inc.*, 2005-509 (La. App. 3 Cir. 12/30/05), 918 So. 2d 1080, 1088, *writ denied*, 2006-0225 (La. 4/24/06), 926 So. 2d 551 (internal citations omitted). "In an action to recover damages for injuries allegedly caused by another's negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not." *Hanks v. Entergy Corp.*, 2006-477 (La. 12/18/06), 944 So. 2d 564, 578 (internal citations omitted).

As far as the "rules of the road," a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety. La. Stat. Ann. § 32:79. A driver approaching a yield sign "shall yield the right-of-way to any pedestrian legally crossing the roadway on which he is driving, and to any vehicle in the intersection or approaching on another highway so closely as to constitute an immediate hazard." La. Stat. Ann. § 32:123. "The driver of a vehicle approaching a favored thoroughfare on an inferior street, controlled by stop signs or yield signs, must not only stop or slow down for the sign before entering into the right-of-way thoroughfare, but must remain stopped until he has ascertained that he can proceed with safety and must yield the right-of-way to

oncoming vehicles approaching so closely on the favored highway as to constitute a hazard." *Burge v. Doty*, 279 So. 2d 273, 276 (La. Ct. App.), *writ denied*, 281 So. 2d 757 (La. 1973) (citing *Doucette v. Primeaux*, 180 So.2d 866 (La.App.3d Cir. 1965); *American Road Insurance Co. v. Irby*, 203 So.2d 427 (La.App.2d Cir. 1967). "Once a right of way motorist in the exercise of ordinary vigilance sees that another motorist has failed to yield the right of way, a new duty thereafter devolves on the right of way motorist to take reasonable steps to avoid an accident if there is enough time to afford him a reasonable opportunity to do so." *Sanchez Fernandez v. Gen. Motors Corp.*, 491 So. 2d 633, 636 (La. 1986). "It is only in exceptional circumstances, where the motorist on the favored street could have avoided the accident by the exercise of the slightest sort of observation and care, that he will be found derelict." *Bourgeois v. Francois*, 245 La. 875, 883, 161 So. 2d 750, 753 (1964).

More than one party may be at fault for the damages sustained in a motor vehicle accident, which is reflected in Louisiana's comparative negligence scheme. *Fontenot v. Patterson Ins.*, 2009–0669 (La.10/20/09), 23 So.3d 259, 267 (citing La. Civ. Code art. 2323). In deciding which parties are responsible, a duty-risk analysis is used in which the plaintiff must prove that: (1) the conduct in question was the cause-in-fact of the resulting harm; (2) the defendants owed a duty to the plaintiff, which the defendants breached; and (3) the risk of harm was within the scope of protection afforded by the duty breached. *Id.* The allocation of fault between comparatively negligent parties is a finding of fact. *Sims v. State Farm Auto. Ins. Co.*, 98–1613 (La.3/2/99), 731 So.2d 197, 199. In apportioning fault, the fact finder shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed. *Gibson v. State Through Dept. of Transp. and Development*, 95–1418 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1005, *writs denied*, 96–1862, 96–1895, 96–1902 (La.10/25/96), 681

So.2d 373–74 (citing *Campbell v. Louisiana Dept. of Transp. and Development,* 94–1052 (La.1/17/95), 648 So.2d 898, 902). In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned by the fact finder, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought..." *Schexnayder v. Bridges*, 2015-0786 (La. App. 1 Cir. 2/26/16), 190 So. 3d 764, 773 (citing *Watson v. State Farm Fire and Cas. Ins. Co.,* 469 So.2d 967, 974 (La.1985)),

Under Louisiana law, a tortfeasor must take the injured person as he finds him. The tortfeasor is responsible for all the natural and probable consequences of his wrong, even though they are more serious or harmful by reason of a pre-existing condition or weakness of the injured person. If the accident results in aggravation of a previous condition of disability or of pain of the injured person, the tortfeasor is liable both for the aggravation of the pre-existing condition and for any new injuries resulting from the accident. However, a plaintiff must prove by a preponderance of the evidence (1) the prior existing condition, and (2) the extent of the aggravation. 18 La. Civ. L. Treatise, Civil Jury Instructions § 18:10 (3d ed.); *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005-06 (La. 1993).

In a personal injury suit, a plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident that caused the injury. *Maranto v. Goodyear Tire & Rubber Co.*, 650 So.2d 757, 759 (La. 1995). Under Louisiana law, "[a] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and

continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition." *Id.* at 761 (quoting *Housley v. Cerise*, 579 So.2d 973 (La. 1991); *see also Fair v. Allen*, 669 F.3d 601, 605 (5th Cir. 2012)). "A tortfeasor is required to pay for the medical treatment of the victim, and even for overtreatment or unnecessary treatment, unless such treatment was incurred by the victim in bad faith." *Ezzell v. Miranne*, 84 So.3d 641, 654 (La. 5 Cir. 2011); *see also Vines v. Wood*, 785 So.2d 126, 131 (La. 2d Cir. 2001); *Antippas v. Nola Hotel Group, LLC*, 265 So.3d 1212, 1218 (La. App. 4 Cir. 2019); *Menard v. Lafayette Ins. Co.*, 31 So.3d 996, 1006 (La. 2010). Nevertheless, "[a]n injured party has a duty to take reasonable steps to mitigate his damages. *Aisole v. Dean,* 574 So.2d 1248 (La.1991); *Britt v. City of Shreveport,* 45,513 (La.App.2d Cir.11/03/10), 55 So.3d 76; *Fletcher v. Simmons,* 37,758 (La.App.2d Cir.10/29/03), 859 So.2d 292." *Young v. Marsh*, 49,496 (La. App. 2 Cir. 11/19/14), 153 So. 3d 1245, 1256.

Louisiana law permits awards for future medical expenses, but they "must be established with some degree of certainty." *Duncan v. Kansas City Southern Railway Co.*, 773 So.2d 670, 685 (La. 2000). "The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence the future medical expense will be medically necessary." *Menard v. Lafayette Ins. Co.*, 31 So.3d 996, 1006 (La. 2010).

General damages, which cannot be "fixed with pecuniary exactitude" take into account mental and/or physical pain and suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of lifestyle which cannot be definitely measured in monetary terms, both in the past and to be anticipated in the future. *Duncan*, 773 So.2d at 682. "Vast discretion is accorded the trier of fact in fixing general damage awards." *Id.* at 682. "The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration.

More specifically, the nature, relative severity, and extent of bodily injuries are qualitative factors that must first be considered by the trier of fact in awarding general damages. The duration of a plaintiff's injury symptoms and the duration of treatment are quantitative factors that must also be taken into account." *Young v. Marsh*, 49,496 (La. App. 2 Cir. 11/19/14), 153 So. 3d 1245, 1252 (citing *LeBlanc v. Stevenson*, 00–0157 (La.10/17/00), 770 So.2d 766; *Thongsavanh v. Schexnayder*, 09–1462 (La.App. 1st Cir.05/07/10), 40 So.3d 989, *writ denied*, 10–1295 (La.09/24/10), 45 So.3d 1074)).

### III.
#### APPLICATION OF FACTUAL FINDINGS TO THE LAW

#### A.  <u>Liability and Allocation of Fault</u>

Based on the Court's findings and legal conclusions, the Court finds that Mouton and Meier were *both* at fault for the June 17, 2014 collision. The Court begins with Meier's role in the collision. Meier was traveling on the "disfavored" road with a yield sign that required Meier to maintain a proper lookout and ensure that the roadway was clear before merging into the right lane of southbound University Avenue.  Even though the right lane of University Avenue may have been clear when Meier reached the yield sign, Meier should have observed Mouton's vehicle and accounted for that vehicle before merging onto University Avenue.  The fact that the two vehicles attempted to enter the right lane almost simultaneously suggests that Mouton was in the process of changing lanes at the time Meier merged onto University Avenue. Meier's failure to maintain a proper lookout and to properly yield to vehicles traveling on the "favored" road (University Avenue) contributed to the collision.

On the other hand, the Court also assigns fault to Mouton.  The Court finds that Mouton was in the left lane of southbound University Avenue immediately prior to the collision. The Court further finds that Mouton attempted to change lanes and move into the right lane just as Meier's

vehicle was merging into the right lane. Given Mouton's vantage point as he approached the I-10 exit ramp, he could have viewed Meier's car if he had been maintaining a proper lookout, and accounted for Meier's vehicle as it merged onto University Avenue. Moreover, the location of the impact points on the two cars – the rear of Meier's car and the front of Mouton's car – indicate that Meier's vehicle was ahead of Mouton's vehicle as Meier attempted to merge. Thus, Mouton would have had an opportunity to see Meier's vehicle attempting to enter University Avenue. Once he began changing lanes, Mouton was required to ensure that the right lane was clear. His negligence in not ensuring that the right lane was clear contributed to the ensuing collision.

As far as allocating fault between Mouton and Meier, the Court has considered both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed. *Gibson v. State Through Dept. of Transp. and Development,* 95–1418 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1005, *writs denied,* 96–1862, 96–1895, 96–1902 (La.10/25/96), 681 So.2d 373–74 (citing *Campbell v. Louisiana Dept. of Transp. and Development,* 94–1052 (La.1/17/95), 648 So.2d 898, 902). "In assessing the nature of the conduct of the parties, the Court has considered: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought." *Schexnayder v. Bridges,* 2015-0786 (La. App. 1 Cir. 2/26/16), 190 So. 3d 764, 773 (citing *Watson v. State Farm Fire and Cas. Ins. Co.,* 469 So.2d 967, 974 (La.1985)). Considering these factors, the Court finds that the negligence of Meier and Mouton contributed equally to 2014 collision. Accordingly, the Court allocates fault as follows: Meier's

fault is 50 percent and Mouton's fault is 50 percent. Mouton's damages will be adjusted accordingly.

### B. Medical Causation

Mouton's medical treatments and expenses fall into three broad injury categories: cervical (neck), lumbar (back), and head. The record also includes evidence of treatment for sinus and dental conditions, but Mouton does not appear to contend that the treatment for these conditions resulted from the June 2014 collision.

#### 1. Head Injury

Starting with Mouton's head-related symptoms, Mouton has not established "but for" causation between the 2014 collision and these symptoms. While Mouton told his treating physicians – Drs. Sledge and Weir – that he suffered a head injury in the accident and may have suffered a complete or momentary loss of consciousness, the record does not contain sufficient evidence to support that claim. In fact, the Court's findings weigh against a finding that Mouton suffered a head injury as a result of the 2014 collision. Witnesses testified at trial that Mouton exited his vehicle shortly after the two vehicles stopped, inspected the damage to his car, and made statements to Meier about that damage. The written EMT report for the collision includes no mention of head trauma or loss of consciousness. Indeed, the EMT report described Mouton's neurological condition as "alert" and his right and left eye as "reactive." (Tr. Exh. 30 at 27) The report also noted that there was no sign of trauma. (*Id.*)

The record also does not support a finding, by a preponderance of the evidence, that Mouton's head-related symptoms are connected to his cervical and lumbar spine issues. The record contains references to "radicular" nerve issues that radiate from the spinal injuries, but nothing in record explicitly connects these conditions to Mouton's head symptoms.

Finally, the damage to both vehicles – unlike the damage reported to Drs. Weir and Sledge – was very minor.  The evidence from the collision does not support a finding that Mouton was involved in a high-speed or high-impact collision sufficient to cause the type of head injuries that he claims.  In sum, Mouton has not established that the 2014 collision caused or contributed to his head-related symptoms.

### 2.  Back Injury

The evidence in the record also does not establish by a preponderance of the evidence that the 2014 collision caused or contributed to Mouton's lumbar or lower back injury. The record shows that Mouton suffered a traumatic back injury as a result of a lifting accident at work approximately a year before the 2014 collision at issue here. The 2013 accident resulted in lower back symptoms, and, at one point, Mouton had to request an EMT as a result of his lower back pain.  The plaintiff was on and off narcotic drugs for pain management during this period. With respect to the 2014 collision, the EMT paramedics who responded to the 2014 collision had no record of Mouton complaining of lower back pain. Mouton also did not raise lower back pain as a symptom with Dr. Bond or any other doctor until almost two months after the 2014 collision. While Dr. Sledge's testimony connects Mouton's back problems to the timeframe of the 2014 collision, Sledge was unaware of the 2013 lifting accident or the traumatic back injury suffered by Mouton as a result of that accident. Moreover, Dr. Romero's testimony casts doubt on the ability to precisely date an injury based on MRIs and X-rays reviewed years after the fact. Accordingly, the Court does not credit Sledge's opinion connecting Mouton's back problems to the 2014 collision.

In sum, Mouton has not met his burden of proof on causation with respect to the lower back injuries.

### 3.  Neck Injury

Turning to Mouton's cervical spine (neck) problems, the record does not contain evidence suggesting that Mouton experienced these problems or symptoms prior to the 2014 accident. Mouton's cervical spine problems are supported by objective evidence revealed on Mouton's MRI images and the nerve study performed by Dr. Weir.  A specific recommendation for surgery may have occurred after the January 2018 truck accident, but that recommendation was based on films, assessment and a nerve study that was performed prior to the 2018 accident.

Dr. Romero's testimony also appears to acknowledge a cervical spine issue, but he opined that the 2014 accident was not sufficiently severe to cause that type of injury.  While that opinion is in line with the physical and testimonial evidence suggesting a very minor, low-speed impact, cervical symptoms seem to first appear in the record immediately following the subject accident. Unlike Mouton's head and back symptoms, Mouton complained of neck pain at the time of the 2014 collision. The fact of a neck injury is also supported by the testimony of Dr. Weir and Dr. Sledge. Accordingly, the Court finds that Mouton has proven by a preponderance of the evidence that the 2014 collision at issue in the case was the cause in fact of his neck injury.

### 4.  Pain Medication

Finally, some of the post-accident medical expenses include pharmacy bills. These bills show that the plaintiff was prescribed pain medication, including narcotic pain medication, *before* the 2014 accident as well as after the accident. While it is possible that Mouton's medication regimen changed as a result of the 2014 accident, the record is unclear as to what medications were prescribed for neck, head or lower back pain. Accordingly, the Court cannot find by a preponderance of the evidence that all the expenses for pain medication claimed by Mouton as past medical expenses were incurred as a result of the 2014 collision.

## III.
### DAMAGES AWARDED

**A.  <u>Limitation of Mouton's Administrative Claim</u>**

At the outset, the Court must address the United States' motion to limit Mouton's claimed damages. At trial, the United States re-urged its Motion to Dismiss Plaintiff's Claims in Excess of the Amount of His Administrative Claim (Doc. No. 9), which the Court previously denied. (Doc. No. 24) The Court denies reconsideration of its ruling on the government's Motion to Dismiss.

**B.  <u>Damages</u>**

The Court finds that Mouton is entitled to damages on account of the injuries he received from the 2014 collision. As noted above, the Court finds that Mouton has proved by a preponderance of the evidence that his neck injuries are the result of the 2014 accident.

### 1.  Past Medical Expenses

Mouton claims total past medical expenses of approximately $156,130.00. (Tr. Exh. 27 at 4) Based on the Court's findings, the Court will award Mouton the medical expenses incurred in connection with Mouton's November 2019 cervical surgery. With respect to the remaining medical expenses, these expenses include treatment not only for Mouton's neck (cervical) injury, but also for Mouton's lower back (lumbar) injury, head injury symptoms, and other medical problems unrelated to the 2014 collision. Because these expenses are not clearly delineated as to injury and cannot be categorized with mathematical precision, the Court will award a portion of those expenses. The Court, therefore, awards Mouton gross past medical expenses of $108,156.00. Reducing this amount by Mouton's comparative fault results in an award of **$54,078.00**.

### 2.  Future medical damages

Mouton claims $109,831.00 in future medical expenses. (Tr. Exh. 28 at 1) This amount, however, represents future lower back (lumbar) treatment. (*Id.*) As the Court previously found, Mouton is not entitled to recover medical expenses for treatment of his lower-back injury. Accordingly, the Court does not award future medical damages.

### 3.  Lost wages

Mouton testified that he missed between two and six weeks of work as a horse groom after the 2014 accident and then worked continuously in various jobs until his January 2018 truck roll-over accident. Subsequent to that accident, Mouton worked as a supervisor at his brother's racing stable until April 2019, when the supervisory role became unavailable and Mouton was unable to do the heavy lifting required by the groomer position. At the same time, Mouton moved into his mother's home to care for her after her own neck surgery in May 2019. At trial, Mouton testified that Dr. Sledge had not indicated when  he would be able to return to work after his neck surgery, nor whether he would impose any restrictions on the work Mouton will be able to do.

Mouton contends that he missed at least two weeks of work due to the 2014 collision, and that he likely would  be unable to work for one year after the neck and back surgeries. Mouton alleges that he earned $10 per hour at the time of the accident, and the record reflects that Mouton was paid $11 per hour at one job. (*Id.*) The record suggests that Mouton's cervical and lumbar surgeries would be performed consecutively, suggesting that Mouton anticipates a six-month recovery period for each surgery. As noted above, Mouton is entitled to compensation only for the cervical injury. The Court finds that Mouton is entitled to recover for the two weeks of lost wages after the 2014 collision for a gross total of $1,600.00. Reduced for Mouton's comparative fault, the Court awards **$800.00**. With respect to future lost wages, the Court finds that Mouton has not

proven an amount of future lost wages by a preponderance of evidence given that his treating physicians could not opine as to the amount of time Mouton would be unable to work after neck surgery.  Nor was there any other credible evidence supporting Mouton's claim that he would miss up to a year of work, especially since this estimate seems to assume surgical procedures on both the back and neck.

### 4.  Property Damages

The Court finds that Mouton is entitled to recover for the damage to his vehicle. The repair estimate in the record totals $8,085.39. (Tr. Exh. 5) This amount will be reduced to an award of **$4,043.00** to account for Mouton's comparative fault.

### 5.  General Damages

The Court finds that Mouton is entitled to an award of general damages in this matter. Plaintiff, his former wife, and his mother testified as to the intensity and duration of Mouton's pain and treatments, and the effect they have had on his life and relationships. The Court found this testimony credible. Mouton also suffered pain and underwent treatment for over five years after the 2014 collision. However, a significant amount of Mouton's pain and suffering appears tied to Mouton's lower-back problems and head-related symptoms, which cannot be tied to the 2014 collision. The Court also notes that Mouton continued to work after the 2014 collision and only stopped working after the January 2018 truck roll-over accident. Mouton also declined recommended physical therapy and delayed surgery to correct his neck condition. Considering all these factors, the Court finds that a gross award of $60,000 fully and fairly compensates plaintiff for his general injuries, including loss of enjoyment of life, pain and suffering, and disability. *See, e.g., Dixon v. Traveler, Ins. Co.,* 842 So.2d 478 (La. App. 4 Cir. 4/2/03). This amount will be reduced to **$30,000.00** to reflect Mouton's comparative fault.

The total amount of damages awarded to Mouton, factoring in his comparative fault, is **$88,921.00.**

Considering the foregoing,

IT IS HEREBY ORDERED that counsel for Plaintiff shall submit a proposed judgment, approved by counsel for the defendant, within fifteen (15) days of the date of this opinion. The judgment should award costs to the plaintiff, reduced commensurate with this Court's allocation of liability, and post-judgment interest to the plaintiff, as allowed by law.[3]

THUS DONE in Chambers on this 21st day of April, 2020.

**ROBERT R. SUMMERHAYS**
**UNITED STATES DISTRICT JUDGE**

---

[3] Prejudgment interest is not available for claims brought under the Federal Tort Claims Act. *See* 28 U.S.C. § 2674.